Curtis Michael **RICHENDOLLAR**,
Plaintiff-Appellee,
Cross-Appellant,

v.

**DIAMOND M DRILLING COMPANY,
INC.**, Defendant-Appellant,
Cross-Appellee,

and

Baker Marine Corporation,
Defendant-Appellee.

No. 84–2492.

United States Court of Appeals,
Fifth Circuit.

March 5, 1986.

Joseph J. Weigand, Jr., Weigand, Weigand & Meyer, Houma, La., for Diamond M Drilling Co.

White, Huseman, Pletcher & Powers, Bradford M. Condit, Corpus Christi, Tex., for Diamond M Drilling, Inc.

Herbert W. Barnes, Michael J. Samanie, Houma, La., for Richendollar.

Richard A. Schwartz, Thelem, Marrin, Johnson & Bridges, Houston, Tex., for Baker Shipyards, Inc. & Baker Marine.

Before CLARK, Chief Judge, POLITZ, and JONES, Circuit Judges.

POLITZ, Circuit Judge:

Invoking diversity jurisdiction and asserting claims for: vessel unseaworthiness under general maritime law, injury to a member of the crew of a vessel under the Jones Act, and vessel negligence under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), Curtis Michael Richendollar sued his employer, Diamond M Drilling Company, and Baker Marine Corporation, a shipyard, for person-

al injuries sustained in a fall. The claims under the Jones Act and general maritime law were voluntarily dismissed.[1] The case was bifurcated for trial, tried first to the jury on liability and then on the quantum of damages. The jury returned a verdict for Richendollar against Diamond M but relieved Baker from any liability. Damages were set at $1,031,015 with a stipulated compensation intervention of $86,024. The trial court ordered a remittitur of $300,000 which the plaintiff accepted without protest. Both parties appeal. For the reasons assigned, we affirm all respects of the judgment except that relating to prejudgment interest which we vacate and remand.

## FACTUAL BACKGROUND

In 1979 Baker undertook to build for Diamond M a jackup drilling rig, the DON E. McMAHON. The rig was constructed in Baker's shipyard near Aransas Pass at Ingleside, Texas. The work began in November 1979; delivery was scheduled for June 1980, but construction fell behind schedule. It was important to Diamond M, for business reasons, to take delivery of the platform before the end of 1980 and to have it ready for transport to a site off the west coast of Africa in early 1981.

Because of the unexpected delay, Baker and Diamond M agreed that Diamond M could assign a crew to preload the drilling rig and prepare it for operations simultaneously with the Baker employees completing construction. Typically, "rigging up" by Diamond M employees would be accomplished after the shipyard personnel finished their work and the vessel was delivered. It was understood that in rigging up, Diamond M employees would not interfere with the work of Baker personnel.

Diamond M sent a 17-man crew, under its area manager. Bob Hart, to prepare

the DON E. McMAHON for oil and gas drilling operations. The crew was supervised by a toolpusher, Roy Harrelson, who reported to Hart. Baker exercised no authority or control over Diamond M employees. The two crews were completely discrete and independent. The only commonality was that they all worked on or around the DON E. McMAHON. Richendollar was a welder on the special outfitting crew.

On October 17, 1980, the DON E. McMAHON was 85% complete, on land, positioned on blocks. It had holes in its hull and was not capable of navigation. Harrelson ordered Richendollar and another Diamond M employee to weld a "hose station" on the starboard side. Richendollar located a work basket, a wire-screen basket he had seen others use, and tack-welded it to the rig to serve as his work platform while welding the hose station. As Richendollar was welding, the other employee jumped into the basket. The bottom of the basket, faultily welded and improperly designed, broke loose and Richendollar fell to the ground, sustaining injuries to his back and left wrist.

The evidence does not establish the owner or custodian of the basket when Richendollar took possession of it. The basket did not match those used by Baker employees. Richendollar did not get it from Baker and did not know who previously had used it. On the date of the accident, there were more than a dozen other companies working in the vicinity of the DON E. McMAHON. The basket could have belonged to any of them or to another company long-gone from the shipyard.

At conclusion of the liability phase, the jury cast Diamond M in judgment, finding that the DON E. McMAHON was a vessel and that negligence of the vessel was solely responsible for Richendollar's injuries. The jury exonerated Baker, finding that

1. Richendollar initially filed only Jones Act and unseaworthiness claims. Diamond M was then paying LHWCA benefits but promptly reduced benefits to maintenance. Richendollar filed a longshoreman's claim with the Department of Labor and the Administrative Law Judge found him to be a longshoreman. Richendollar there-

after moved to dismiss without prejudice the Jones Act and unseaworthiness claims. The court dismissed these with prejudice. The complaint was amended to allege a negligence action under 33 U.S.C. § 905(b) against Diamond M. Richendollar also alleged a Texas law claim against Baker as owner of the subject premises.

the shipyard neither owned nor controlled the basket, that it was not negligent, and that Richendollar was a shipyard licensee, not an invitee. The trial judge ultimately ordered a remittitur of $300,000 and denied prejudgment interest, concluding that even after the remittitur Richendollar had been "generously treated by the Jury" and "no additional recovery in the form of pre-judgment interest is supported by [Richendollar's] needs."

## JURISDICTION

Jurisdiction must be noted. It would appear all have assumed that this case either presents a federal question, vesting 28 U.S.C. § 1331 jurisdiction, or rests on admiralty jurisdiction. Both assumptions are erroneous; there is neither federal question nor admiralty jurisdiction.

In *Parker v. South Louisiana Contractors, Inc.*, 537 F.2d 113 (5th Cir.1976), *cert. denied*, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977), we first addressed the jurisdictional aspects of the 1972 Amendments to the LHWCA, specifically § 5(b) of that Act, 33 U.S.C. § 905(b). We there held "that Congress did not intend section 905(b) to create a new or broader cause of action in admiralty.... Taken as a whole, the manifest purpose of section 905(b) is to curtail rather than expand the availability of third party actions in admiralty. With respect to third party actions for negligence, ... the boundaries of maritime jurisdiction as defined under prior law (*e.g. Victory Carriers* [404 U.S. 202 (1971)]) were neither expanded nor constricted...." *Id.* at 117. In *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971), the Supreme Court restated the traditional rule:

The historic view of this Court has been that the maritime tort jurisdiction of the federal courts is determined by the locality of the accident and that maritime law governs only those torts occurring on the navigable waters of the United States.

*Id.* at 205, 92 S.Ct. at 421 (*citing Thomas v. Lane*, 23 F.Cas. 957 (C.C.Me.1813) (Story, J.)).

Citing *Parker*, we recently restated in *Christoff v. Bergeron Industries, Inc.*, 748 F.2d 297, 298 (5th Cir.1984) "that § 905(b) neither extended the boundaries of traditional admiralty jurisdiction nor converted ordinary tort claims against vessels into federal questions independent of admiralty." Accordingly, the presentation of a claim under § 905(b) does not automatically raise a federal question cognizable under 28 U.S.C. § 1331. The nature of the underlying claim must be considered, for that claim determines whether there is federal subject matter jurisdiction.

Here, the underlying claim is a tort action for personal injuries against the owner of a vessel under construction and the owner of a shipyard constructing the vessel. Unless the claim rests in admiralty, there is no § 905(b) jurisdiction. That determination is essentially fact-bound and turns on an inquiry into the geographic location of the tort and the activity involved. As we observed in *Christoff*, 748 F.2d at 299:

Before 1972, the test for admiralty jurisdiction over torts was purely geographic: if the tort occurred on navigable waters, admiralty jurisdiction was present. *Hall v. Hvide Hull No. 3*, 746 F.2d 294, 303 (5th Cir.1984).... Then, the Supreme Court, in *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972), added the requirement "that the wrong bear a significant relationship to traditional maritime activity."

We need not resolve the nexus test, *i.e.*, whether rigging up the DON E. McMAHON for oil and gas drilling activities bears a "significant relationship to traditional maritime activity," *id.*, for it is apparent that the situs test is not met. The DON E. McMAHON was under construction on land and at the time of the accident. It was not in navigable waters. There is no federal admiralty jurisdiction for such

an injury occurring on land. *Victory Carriers; Parker; Christoff.*

Finding a lack of federal question or admiralty jurisdiction is not fatal to this action, however, for we find the requisite diversity of citizenship jurisdiction, 28 U.S.C. § 1332, between Richendollar, a Louisiana citizen, and the corporate, non-Louisiana-citizen defendants. *Trussell v. Litton Systems, Inc.,* 753 F.2d 366 (5th Cir.1984).

## ANALYSIS

### A. *Claims against Baker Marine*

In his appeal of the judgment in favor of Baker, Richendollar complains of the jury charge relative to the determination of his status as an invitee or licensee in the Baker shipyards, and of the adequacy of the evidence on that issue and on the question of Baker's negligence. Finding no merit in any assignment of error, we affirm the judgment as to Baker.

Richendollar contended at trial that he was an invitee on Baker's premises and that Baker was negligent in failing to provide him a safe place to work. Baker countered that Richendollar was using a basket which it neither owned nor controlled and, as to the basket, was therefore merely a licensee. Consistent with that status, Baker maintains that its only obligation was to avoid injuring Richendollar through willful or wanton conduct. The trial court submitted interrogatories to the jury about Baker's ownership or control of the work basket, and asked whether Richendollar was Baker's invitee or licensee with respect thereto. The jury responded that Baker neither owned nor possessed the basket and that Richendollar was a licensee. The judge instructed the jury on Texas law respecting invitees and licensees. No objection was made to this part of the charge which, under Fed.R.Civ.P. 51, we review only for plain error which might result in a miscarriage of justice. *Williams v. Hoyt,* 556 F.2d 1336 (5th Cir.1977), *cert. denied,* 435 U.S. 946, 98 S.Ct. 1530, 55 L.Ed.2d 544 (1978).

■ The pertinent parts of the jury charge on the invitee/licensee issue include:

Specifically, the plaintiff complains that Baker was negligent to him as an invitee, saying that Baker had a duty to use reasonable care ... to make and keep the premises safe for persons invited to use the premises. If the plaintiff was on premises over which the defendant had control, defendant-Baker, or which Baker owned and the plaintiff was there with Baker's knowledge and for the mutual benefit of the plaintiff and Baker, then the plaintiff is an invitee. It's not necessary that the invitee be expressly issued an invitation to come onto the premises, but that invitation may be implied under the circumstances, but there has to be more than mere acquiescence; that is, mere sufferance for somebody to be there.

To be successful on his claim that he was an invitee, Mr. Richendollar must prove that he was an invitee while occupying that basket; that is to say that it was Baker's basket or a basket controlled by Baker and present for the use of all who came along and inuring to the mutual benefit of the user and Baker.

Now, that mutuality of benefit is important here because if Mr. Richendollar does not prove himself to be an invitee, he is a licensee in this case.

The court then went on to explain that if Richendollar was an invitee as respects the basket, Baker had a duty to use reasonable care to assure that it was safe for the use intended and to warn of non-apparent, non-obvious dangers. If, on the other hand, Richendollar was only a licensee, Baker would be liable only for willful or wanton conduct or conscious indifference.

As in all instances in which a part of the charge to the jury is challenged, we view the entire charge to see whether it is "comprehensive, balanced, fundamentally accurate, and not likely to confuse or mislead the jury." *Scheib v. Williams-McWilliams Co., Inc.,* 628 F.2d 509, 511 (5th Cir.1980). Applying that test we are convinced that

the charge as given accurately reflects Texas law.

In *Adam Dante Corp. v. Sharpe*, 483 S.W.2d 452 (Tex.1972), the Texas Supreme Court adopted the rule enunciated in *Restatement (Second) of Torts* § 343 (1965). Under that rubric an occupier must exercise reasonable care to avoid the negligent injury of invitees, warning of latent dangers and making reasonable inspections of the premises. The occupier generally had no duty to protect an invitee from known or knowable dangers. *Adam Dante; Halepeska v. Callihan Interests, Inc.*, 371 S.W.2d 368 (Tex.1963); *Harvey v. Seale*, 362 S.W.2d 310 (Tex.1962). This Texas "no duty" doctrine evolved until it became incumbent upon a plaintiff to prove, in his case-in-chief, lack of knowledge of the dangerous condition. In *Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex.1978), the Texas Supreme Court expressly abolished "the so-called no-duty concept" and announced that henceforth the liability of occupiers to invitees would be based on general principles of negligence and contributory negligence. *Id.* at 517, 519–21.

Texas law defines invitees as those who enter premises for the mutual benefit of the entrant and the occupier. *Galveston Oil Co. v. Morton*, 70 Tex. 400, 7 S.W. 756 (Tex.1888) (first adopting the mutual advantage test of invitee status); *Atchison, T. & S.F. Ry. v. Smith*, 563 S.W.2d 660 (Tex.Civ.App.—Waco 1978, *writ ref'd n.r.e.*); *Texas Power & Light Co. v. Holder*, 385 S.W.2d 873 (Tex.Civ.App.—Tyler 1964, *writ ref'd n.r.e.*); *Mendez v. Knights of Columbus Hall*, 431 S.W.2d 29 (Tex.Civ. App.—San Antonio 1968, *no writ*).

The duty to licensees is substantially less than that owed invitees. As the Texas Supreme Court stated in *State v. Tennison*, 509 S.W.2d 560, 562 (Tex.1974) (citations omitted):

[I]f the person injured was on the premises as a licensee, the duty that the proprietor or licensor owed him was not to injure him by willful, wanton or gross negligence .... An exception to the general rule is that when the licensor has knowledge of a dangerous condition, and the licensee does not, a duty is owed on the part of the licensor to either warn the licensee or to make the condition reasonably safe.... Texas has conformed to the generally recognized rule that the duty to warn licensees of dangerous conditions arises only in those instances where the licensor knows of the condition likely to cause injury.

■ Finally, we review that part of the charge which was subjected to timely objection, the supplemental instruction concerning the duty of Baker with respect to control of the equipment of another on its premises. The court instructed:

Baker Marine controls what it owns and possesses.... It controls all that it owns and possesses. It is not obligated to control equipment of outside contractors properly on its premises, although it can assume control by its conduct and can assume control by its agreement to do so.

This adequately distills Texas law. *See generally Olivier v. Snowden*, 426 S.W.2d 545 (Tex.1968).

The charge given to the jury fairly reflected the controlling provisions of Texas law. The jury received the guidance needed for a proper resolution of this dispute.

The challenge leveled by Richendollar as to the sufficiency of the evidence is not persuasive. We have frequently noted the applicable standard for review of sufficiency of the evidence assignments of error in civil cases. In *Carlton v. Shelton*, 722 F.2d 203, 205 (5th Cir.1984), we reminded:

In determining the sufficiency of the evidence, we apply well-settled standards of appellate review. If the state of the proof is such that reasonable and impartial minds could reach the conclusion expressed in the jury's verdict, we must not disturb the jury's findings on appeal.

■ Richendollar argues that there is insufficient evidence to support the finding that he was a licensee in the shipyard. Assuming *arguendo* that the basket was Baker's, a fact not established in this

record, for entitlement to invitee status it would be necessary for Richendollar to show that his use constituted a profit or advantage for Baker. *Olivier.* The record contains ample evidence upon which the jury could have based its conclusion that Richendollar's use of the basket was not for Baker's gain or advantage but was solely related to Diamond M's interest in preparing the rig for transshipment and use immediately upon its release by the shipyard.

■ Nor are we impressed by the contention that the evidence does not support the finding that Baker was not negligent. Pretermitting the question about ownership and control of the defective work basket, there is sufficient evidence in support of the jury finding. Richendollar was employed by Diamond M and dispatched to the DON E. McMAHON to do Diamond M work, using Diamond M equipment, under Diamond M supervisors, and following Diamond M safety practices and procedures. The Diamond M toolpusher, Roy Harrelson, was in charge of the overall operation, including safety procedures. There is an abundance of evidence from which the jury could find that Baker reasonably relied on Diamond M to guide and control its own crew and equipment in a manner consistent with meaningful safety practices.

### B. *Claims against Diamond M*

Richendollar sued his employer under 33 U.S.C. § 905(b) as owner of the vessel, claiming vessel negligence. The limiting amendments to the LHWCA enacted in 1984[2] do not apply to Richendollar's accident, which occurred before adoption of the amendments. Prior to the 1984 amendments, an employee could recover compensation benefits from his employer and simultaneously seek tort damages against his employer, as vessel owner, under § 905(b).

Our disposition of this appeal is largely guided by our recent decision in *Pichoff v. Bisso Towboat Co., Inc.*, 748 F.2d 300 (5th Cir.1984), in which we cited with approval the decision by our Second Circuit colleagues in *Smith v. Eastern Seaboard Pile Driving, Inc.*, 604 F.2d 789 (2d Cir.1979). In *Pichoff* the plaintiff was injured while repairing his employer's crewboat. A fuel tank located in the bilge was leaking. In supervising the work, Bisso's general manager told Pichoff to repair the fuel leak. Pichoff requested a "drop light." When none was immediately available, the general manager gave Pichoff a flashlight and ordered him to get about the task of readying the boat. Bisso was eager to complete repairs so the crewboat could be put into service and generate revenue. While working in the bilge, Pichoff was injured, and a vessel negligence suit under § 905 was ultimately filed.

Bisso argued that if it was negligent, it was negligent as a vessel repairer and not as an owner. Bisso's argument was rejected by this court, which noted that the trial court had found negligence in the failure to provide adequate lighting and in ordering Pichoff to proceed without delay because of the tight schedule, resulting from what Bisso perceived to be its financial interests. The latter was considered a function of the vessel owner and not the vessel repairer. In holding Bisso liable under § 905(b) as vessel owner, we quoted the *Smith* observation that even during repair or longshoring operations, " 'supervisory personnel in particular will continue to fulfill their general duties as agents of the shipowner, and the negligent discharge of these responsibilities can still result in liability to the vessel.' " *Pichoff,* 748 F.2d at 303 (*quoting Smith,* 604 F.2d at 796 n. 5). We further held that even if Bisso was negligent in part as owner and in part as repairer, "its negligence as owner will support a judgment against it for all of Pichoff's

**2.** The LHWCA Amendments of 1984, Pub.L. No. 98–426 §§ 4(b), 5(a)(1)(b), 98 Stat. 1639, 1641 (effective September 29, 1984) amended 33 U.S.C. § 905(b) and proscribe the filing of a personal injury suit by one engaged in ship- building, repairing, or breaking services against his employer even though the employer is owner of the vessel. This charge affects only claims arising out of injuries occurring after the effective date of the amendments.

damages. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 264, 99 S.Ct. 2753, 2758, 61 L.Ed.2d 521 (1979)." *Pichoff*, 748 F.2d at 303 n. 4.

Richendollar's vessel negligence claim includes a contention that he was not furnished a safe place to work and that his supervisor, Roy Harrelson, was negligent, which negligence was imputed to Diamond M as vessel owner. In support of his contention that Diamond M, as vessel owner, was obligated to provide him a safe place to work, he cites *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); *Chiasson v. Rogers Terminal & Shipping Corp.*, 679 F.2d 410 (5th Cir.1982); and *Pluyer v. Mitsui O.S.K. Lines*, 664 F.2d 1243 (5th Cir.1982). The argument that the vessel owner must furnish a safe place to work is well-founded. The House Report on the 1972 amendments to the LHWCA, which added § 905(b), states:

> Permitting actions against the vessel based on negligence will meet the objective of encouraging safety because the vessel will still be required to exercise the same care as a land-based person in providing a safe place to work. Thus, nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition.

H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. 118, *reprinted in* 1972 U.S.Code Cong. & Ad.News 4698, 4704. Richendollar's suggestion that any negligent discharge of duties by the Diamond M supervisors (particularly by Roy Harrelson) can result in a finding of vessel negligence is likewise well-founded to the extent Harrelson was acting on behalf of Diamond M in its capacity as vessel owner.

■ It is clear, utilizing the unerring 20/20 visual acuity always found in hindsight, that the work basket was dangerously faulty. The bottom had been welded to the underside of the frame instead of to the top of the frame. When the welds broke, there was nothing to restrain the bottom from falling, taking Richendollar with it. Richendollar was told to weld the hose rack on the starboard side. To do this he had to have a means of reaching the worksite with his welding equipment. A work basket, tack-welded to the platform at the work area, was the apparent answer. If Diamond M furnished the faulty basket, it furnished Richendollar with an unsafe place to work and is liable. If Diamond M did not furnish a safe basket, but left Richendollar to rummage on his own, it failed to provide him with a safe place to work. In either instance Diamond M is guilty of vessel negligence.

Roy Harrelson, the man to whom the entire Diamond M rigging-up crew reported, from whom they all took orders, and who was the Diamond M representative responsible for safety on the DON E. McMAHON, either provided Richendollar with an unsafe basket or failed to provide him with a safe basket or to take other available safety precautions. This negligence is attributable to Diamond M either entirely as vessel owner or in part as vessel owner. In either instance vessel negligence is extant and Diamond M is liable.

Diamond M contends that the trial court erred in the jury instruction on § 905(b), citing *Helaire v. Mobil Oil Corp.*, 709 F.2d 1031 (5th Cir.1983). We find *Helaire* inapposite for the vessel owner there did not actively participate in the unloading operation during which the accident occurred. Diamond M was not only actively involved, it was doing the entirety of the work of rigging up the vessel during the course of which the accident occurred.

We conclude that there is sufficient evidence to support the jury's finding that Diamond M was negligent as owner of the DON E. McMAHON, and that its negligence was responsible for the injuries sustained by Richendollar.

## C. *Remittitur*

■ Richendollar contends that the district court abused its discretion in ordering a remittitur of $300,000. The record reflects that the remittitur was accepted.

The issue is therefore not subject to appeal. *See, e.g., Donovan v. Penn Shipping Co.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977); *Baltezore v. Concordia Parish, Sheriff's Dept.,* 767 F.2d 202 (5th Cir. 1985).

### D. *Prejudgment interest*

Finally, Richendollar maintains that the court should have allowed prejudgment interest, arguing the applicability of maritime law, citing, *inter alia, Webster v. M/V MOOLCHAND, Sethia Liners, Ltd.,* 730 F.2d 1035, 1040 (5th Cir.1984) ("Although the awarding of prejudgment interest lies within the discretion of the judge, 'the allowance of prejudgment interest in maritime law is the rule, rather than the exception.'"); *Helaire; Masters v. Transworld Drilling Co.,* 688 F.2d 1013 (5th Cir.1982) (Awarding prejudgment interest "is well-nigh automatic in suits in the admiralty.").

In *Webster v. M/V MOOLCHAND* federal jurisdiction was based on diversity of the parties' citizenship, as in the case at bar. Plaintiff argued that state law was applicable and under the law of Louisiana money judgments typically bear interest from date of judicial demand. We demurred and held that since the situs of the injury was on a vessel in navigable waters, and the activity bore a substantial relation to maritime activity, "maritime rather than state law must apply." 730 F.2d at 1040. In the case at bar the accident did not occur on a vessel in navigable waters; as a consequence, the maritime rules are not necessarily preemptive. The result, however, of applying maritime law or Texas law should yield little difference.

In a recent landmark decision, the Texas Supreme Court overruled a long line of precedent and announced a rule allowing prejudgment interest on awards for damages accruing prior to the date of judgment. In *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 553–54 (Tex.1985), the court held:

> The time has come to revise the prejudgment interest rule to make injured par-

ties whole and restore equity and symmetry to this area of the law. We therefore hold that, as a matter of law, a prevailing plaintiff may recover prejudgment interest compounded daily (based on a 365-day year) on damages *that have accrued by the time of judgment.* (Emphasis in original.)

See also *Crown Central Petro. Corp. v. National Union Fire Ins. Co.,* 768 F.2d 632 (5th Cir.1985). We remand for the allowance of prejudgment interest on that portion of the damages award which accrued prior to the entry of judgment. It will be necessary for the court to separate the *en globo* awards into that which had accrued and that which had not yet accrued as of the date of judgment, allowing appropriate prejudgment interest on the former.

AFFIRMED as to the liability of Baker and Diamond M; AFFIRMED as to the ruling on remittitur; VACATED and REMANDED as to the disallowance of prejudgment interest.

CLARK, Chief Judge, concurring in part and dissenting in part:

The majority's discussion of jurisdiction leaves me with considerable doubt, but assuming the § 905(b) action against Diamond M was properly before the district court, no cause of action was proven. I respectfully dissent from that part of the majority opinion that affirms the resulting judgment of $1,031,015.

The unseaworthiness-indemnity circle created by *Sieracki/Ryan* subjected an employer who provided LHWCA coverage to both compensation payments and tort remedies. According to *Scindia,* in 1972 Congress "radically changed this scheme of things," and in doing so, provided a § 905(b) statutory right of action against a vessel for negligence. At the time of Richendollar's accident, the statutory right of action was limited thus:

> If [plaintiff] was employed by the vessel to provide ship building or repair services, no such action shall be permitted if

the injury was caused by the negligence of persons engaged in providing ship-building or repair services to the vessel.

The majority relies on *Pichoff* from this circuit and *Smith* from the second Circuit to affirm a right of tort recovery against Diamond M, an employer who has already paid Richendollar $86,024 in LHWCA coverage. Both *Pichoff* and *Smith* are distinguishable in theory and in fact. The majority violates the exclusive remedy provision of the LHWCA when it fails to observe those distinctions here. The statutory remedy created under § 905(b) is a third party remedy. A principal purpose of the 1972 LHWCA amendments was to control tort recoveries against employers who provided compensation protection. That purpose is thwarted in this case.

*Smith* allowed a third party remedy against a vessel in a case in which the shipowner-employer also undertook to provide repair services with its own employees. In *Smith,* the president of the company that owned the vessel and employed the drowned diver was personally in charge of the repair operation which resulted in the diver's death. The Second Circuit observed, "[T]he key issue is whether the shipowner's employees who were at fault committed the negligent act in their capacity as agents of the vessel on the one hand or as employees performing ... repair services on the other." The appellate court reversed the trial court's determination that all persons present at the scene of the fatal dive were engaged in the "single mission" of repair service. This reversal was based on the fact that the company president was in charge of the repairs and equally in charge of the vessel's normal operations. The failure of the vessel to provide the diver a safe place to work was not "at any time delegated to employees acting primarily as repairmen."

Based on *Smith,* this circuit in *Pichoff* affirmed a trial court finding that the vessel owner's general manager of all New Orleans yard operations was acting to further the corporate concern as vessel charterer when he ordered Pichoff to hurry his

inspection work. Thus, the court observed it was rational and defensible to conclude that the general manager's negligence was at least partly in his capacity as representative of the vessel owner and separate in identity from his capacity as supervisor of the repair work that injured Pichoff.

Neither *Smith* nor *Pichoff* apply here. Harrelson, the person in charge of the small group of employees that included Richendollar, was no more than a fellow servant. He was engaged in precisely the same limited single venture: "rigging up" the DON E. McMAHON. Employees of Diamond M were working on a structure standing on blocks on dry land. While the thing they were working on was classed as a vessel for some purposes, it was, as the majority observed, not capable of navigation; therefore Harrelson could not have been in charge of its navigation. More significantly, Harrelson was not in charge of any operation of the DON E. McMAHON other than the "rigging up," nor was he representing Diamond M in any other capacity. He was employed by Diamond M solely to make the DON E. McMAHON functional. He was, indeed, set to accomplish a single mission, and Richendollar was engaged in that exact mission.

The sine qua non of § 905(b) statutory liability for vessel negligence is the presence of a vessel which admiralty regards as a separate entity distinct from its owner. Here, no such third entity existed. No president, no general manager acted for the DON E. McMAHON in ordering or permitting Richendollar to perform his work in an unsafe manner or at an unsafe place. No vessel negligence occurred. Harrelson's fault was the fault of a fellow shipbuilder or rigger-upper, if you will. Such negligence cannot be imputed to Diamond M under § 905(b).